**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

ROBERT ANTHONY HIGH,

                      Petitioner,

    v.

DWIGHT NEVEN, et al.,

                      Respondents.

Case No. 2:11-cv-00891-APG-VCF

**ORDER**

Petitioner's counseled, first-amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is before the court for final disposition on the merits (ECF No. 21).

## I.    Procedural History and Background

On October 30, 2008, a jury found petitioner guilty of count 1: first-degree kidnapping; counts 2,3,4,6,7, and 10: lewdness with a child under age fourteen; count 5: sexual assault of a minor under age fourteen; and count 9: administration of a drug to aid commission of a felony; and not guilty of count 8: attempted lewdness with a child under age fourteen. Exhs. 66-67.[1]

On January 15, 2009, the state district court sentenced petitioner as follows: count 1: five years to life; counts 2, 3, 4, 6, 7, 10: ten years to life on each count, to run concurrently with each other and with count 1; count 5: twenty years to life, consecutive to count 1; and count 9: sixteen to seventy-two months, to run concurrently with counts 1-7. Exh. 69 at 12-14. The court filed the judgment of conviction on January 27, 2009. Exh. 71.

Petitioner appealed. Exh. 73. The Nevada Supreme Court affirmed his convictions on February 3, 2010, and remittitur issued on March 2, 2010. Exhs. 94, 95.

On June 10, 2010, petitioner filed his first proper person state postconviction petition for writ of habeas corpus. Exh. 103. On September 16, 2010, the state district court

---

[1] Exhibits referenced in this order are exhibits to the first-amended petition, ECF No. 21, and are found at ECF Nos. 22-29, 46.

1

orally denied the petition, and the court filed findings of fact, conclusions of law and order denying the petition on November 22, 2010.  Exhs. 2, 112.  The Nevada Supreme Court affirmed the denial of the first state postconviction petition on April 6, 2011, and remittitur issued on July 6, 2011.  Exhs. 118, 123.

Meanwhile, on or about March 23, 2011, petitioner dispatched his first federal habeas petition.  2:11-cv-0454-JCM-LRL, ECF No. 1-1.  On April 1, 2011, the district court dismissed the petition without prejudice as wholly unexhausted; petitioner's appeal of the denial of his first state postconviction petition was pending at that time.  2:11-cv-0454-JCM-LRL, ECF No. 7.  The court also denied petitioner's motion for stay and abeyance and denied a certificate of appealability.  *Id*. at 2-3.

The Ninth Circuit granted petitioner a certificate of appealability on two issues:

(1) [W]hether the district court improperly determined that the petition was wholly unexhausted, and, if not, (2) whether the district court has discretion to use the stay and abeyance procedure outlined in *Rhines v. Weber*, 544 U.S. 269 (2005), and *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), to stay and hold in abeyance a habeas petition containing only unexhausted claims.  Case No. 11-16139, ECF No. 2-1 at 1.

Also while the appeal of the denial of the first state postconviction petition was pending, petitioner filed a second proper person state postconviction petition on April 4, 2011.  Exh. 116.  The state district court denied the petition as untimely pursuant to NRS 34.726 and successive pursuant to NRS 34.810(1)(b)(2).  Exh. 127.  On April 11, 2012, the Nevada Supreme Court affirmed the denial of the second state postconviction petition as untimely and successive and an abuse of the writ, and concluded that petitioner failed to demonstrate good cause to excuse the procedural bars.  Exh. 134.  Remittitur issued on May 8, 2012.  Exh. 136.

Before the Nevada Supreme Court issued the order affirming the denial of the first state postconviction petition and while the second state postconviction petition was pending, petitioner dispatched the instant second federal petition on May 27, 2011 (ECF

2

No. 7).  The Ninth Circuit granted petitioner's motion to defer briefing on the appeal of his first federal petition pending resolution of his second federal petition.  Case No. 11-16139, ECF Nos. 8, 9.

Petitioner filed a counseled amended federal petition on May 30, 2012 (ECF No. 21). The court granted petitioner's motion for leave to conduct discovery (ECF No. 32, 39). Following discovery, petitioner filed supplemental exhibits but did not further amend his petition (ECF Nos. 45, 46).  On March 2, 2015, this court granted in part respondents' motion to dismiss (ECF No. 57).  Respondents have now answered the remaining grounds (ECF No. 62), and High replied (ECF No. 68).

II.    **Legal Standard -- AEDPA**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the

state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

III. **Remaining Grounds**

The remaining claims in grounds 2, 5 and 6 are claims of ineffective assistance of trial or appellate counsel. Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

5

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of

6

reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

**Ground 2**

High alleges that trial counsel rendered ineffective assistance in violation of his Sixth and Fourteenth Amendment rights when counsel failed to present expert testimony regarding the reliability of the Las Vegas Metropolitan Police Department's crime laboratory and its test results in this case. At trial, the state's forensic analyst testified that shortly before trial some typographical errors in in her DNA report were brought to her attention, and therefore she issued a corrected report on the day trial started, and issued a second corrected report ten days later. High argues that counsel also failed to effectively object to the evidence (ECF No. 21, pp. 22-28).

Affirming the denial of this claim in his state postconviction petition, the Nevada Supreme Court stated that

> appellant claimed that trial counsel was ineffective for failing to call an expert witness regarding the DNA evidence. Appellant failed to demonstrate that trial counsel was deficient or that he was prejudiced. Trial counsel consulted with an expert regarding the DNA evidence and decided not to present his testimony. Tactical decisions of counsel are virtually unchallengeable absent extraordinary circumstances. *See Ford v. State*, 784 P.2d 951, 953 (Nev. 1989). Therefore, the district court did not err in denying this claim.

Exh. 118, p. 3.

Julie Marschner, forensic scientist with the Las Vegas Metropolitan Police Department (Metro) Forensic Laboratory, testified at trial for the State. Exh. 62, pp. 8-

71. Marschner explained the her testing process and stated that the victim's DNA was identified in the swabs from High's nipples.[2]  *Id.* at 25.  She also testified that some typographical errors in her April 2007 report were brought to her attention in October 2008.  *Id.* at 28.  She stated that she mistakenly wrote JM-4 instead of JM-5 as the sample designator when the report was discussing a sample from the victim.  *Id.* at 29-30.  In that instance, Marschner indicated that the victim's DNA was found on the swabs from High's nipples—but the report listed the victim's name but with sample JM-4.  JM-4 was the sample designator from one of High's samples.  Marschner explained that DNA from the nipple swabs was female, thereby eliminating High as a contributor of the DNA found on his nipples.  *Id.* at 22-24, 52, 61-63.  She testified that she subsequently also discovered that at one point in the report she referred to the victim's vaginal swab as 6B instead of 6A.  *Id.* at 31.  She testified that High's DNA was not found on the vaginal swab, and that neither typographical error had any effect on the conclusions of the report.  She stated that her manager, the director of the forensic lab, reviewed the report again after the corrections.  The main, relevant conclusions of the report were that the victim's DNA was found on the swabs from High's nipples; the victim's DNA was not found in any other samples from High, and High's DNA was not found in any samples taken from the victim.  No semen and no DNA from High was detected on any component of the sexual assault kit.  *Id.* at 90-91.

Defense counsel elicited the following testimony on cross-examination: the swabs are wooden swabs with cotton on the end and look essentially identical to each other and Marschner works with large numbers of swabs in many different ongoing cases at the same time.  *Id.* at 35, 55-56.  Defense counsel questioned Marschner about another difference in the final report from the April 2007 report; she explained that she erred in including two hair samples in a list of samples tested because she had decided not to

---

[2] Such finding corroborated the victim's testimony (discussed below) that High asked her to lick his nipples several times over the course of the night and the next morning.  *See* exh. 57, pp. 42-99, 137-149,152-155.

8

attempt to further test the hair samples. When she reviewed the report in October 2008, she removed the reference to the two hair samples. *Id.* at 39-40.

Defense counsel raised a fourth error contained not in the reports, but in Marschner's notes, which incorrectly referred to "JM-1C" as a photograph of the victim's underpants when "JM-1C" was actually swabs from the victim's mouth and lips. *Id.* at 43-45. Marschner testified these were merely typographical that did not affect the results of the DNA analysis or any other scientific conclusions or results. *Id.* at 32, 45, 47, 48, 61-64. Defense counsel also elicited testimony from Marschner that lab procedures have been changed and improved since the report at issue. *Id.* at 41-42.

The Metro DNA lab manager, Kim Murga, testified. Exh. 62, pp. 72-112. She explained that at the State's request, she "went back with the entire case file. I looked at all of the raw data that was generated, all of the raw – the original worksheets that were conducted and created in the laboratory. I reviewed all the data and compared it with the question and the known samples that we had and verified that. And in fact, the science was okay, it was a typographical error in the report." *Id.* at 81. She elaborated that Marschner's controls had worked as normal, and there appeared to be no contamination or sample switches. *Id.* at 82-83.

In ground 2 High also claims that his counsel was ineffective for failing to present expert testimony to challenge the reliability of the Metro lab DNA report. Respondents point out that early in the case defense counsel alleged there were "serious mistakes" in the DNA testing and requested the DNA be retested. Exh. 23, p. 4. Defense counsel indicated that he intended to call his own expert to question the validity of the DNA results, and he sent the DNA to an independent expert. Exhs. 31-32, 39, 41. However, after receiving the expert's report, defense counsel informed the court at a status hearing: "suffice it to say, I'm not going to be calling this expert to testify and will be moving to strike his name ... from the witness list." Exh. 46; *see also* exh. 64, pp. 108-123.

9

The state-court record reflects that defense counsel vigorously challenged the Metro lab witnesses about their testimony that errors in the DNA report were typographical and did not change the results of the report. With respect to defense counsel's decision not to call the expert that he had retained to re-test the DNA, respondents are correct that there is nothing in the record to indicate that the evidence could not be re-tested. Moreover, High's claim that defense counsel was ineffective for failing to call the defense expert is belied by the clear inference in the record that, having seen the defense expert's conclusions, defense counsel determined it was not in High's best interest to have the expert testify.

High has failed to demonstrate that the Nevada Supreme Court's decision affirming the denial of this claim is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The court accordingly denies ground 2.

**Ground 6 (2)**

High argues that trial counsel was ineffective for failing to move for an independent psychological examination of the alleged victim due to her inconsistent statements (ECF No. 21, p. 37). He argues that when Detective Twers interviewed the victim contemporaneously with the alleged events on February 24, 2007, she responded to "the few non-leading questions by saying she did not remember what happened." *Id.* at 29.

The Nevada Supreme Court affirmed the denial of this claim:

> Appellant claimed that trial counsel was ineffective for failing to file a motion for an independent psychological examination of the victim. Appellant failed to demonstrate that trial counsel was deficient or that he was prejudiced. Appellant failed to demonstrate that the motion would have been successful, *see Koerschner v. State*, 13 P.3d 451, 455 (Nev. 2000) (holding that a defendant must demonstrate that a compelling need exists for the examination); *see also Abbott v. State*, 138 P.3d 462, 471 (Nev. 2006) (reaffirming the test set forth in *Koerschner*), and counsel is

not deficient for failing to file futile motions.  *See Donovan,v. State*, 584 P.2d 708, 711 (Nev. 1978).

Exh. 118, pp. 2-3.

In denying this claim in the state postconviction petition, the state district court found:

> Defendant also claimed that counsel was ineffective for failing to request an independent psychological examination of the victim.  While counsel did not request an independent psychological examination of the victim, Defendant fails to show how he was prejudiced or how the results of the trial would have been different since Defendant was able to question the victim's credibility in front of the jury with the aide of Dr. Mark Chambers.
>
> Furthermore, Defendant failed to meet the *Koerschner* standard to demonstrate there was a compelling need for some sort of additional psychological examination of the victim.  The State did not obtain some benefit from an expert in psychology or psychiatry, the evidence of the offense was supported by more than just the testimony of the victim, and he failed to demonstrate that there was a reasonable basis for believing that the victim's mental or emotional state may have affected her veracity.  Accordingly, counsel was not ineffective for failing to request an independent evaluation.

Exh. 112, pp. 4-5.

The State elicited the following testimony from the then-ten-year-old victim at trial: when she was eight High picked her up from her house late in the evening, brought her to his apartment, and carried her into his bedroom.  Exh. 57, pp. 42-99, 137-149,152-155.  He told her to change her clothes and he dressed her in a big t-shirt or tank top.  High changed to a t-shirt and shorts and asked the victim to massage his shoulders, which she did.  He asked her to lick his nipples, which she did after initially refusing.  She testified with specificity that he touched her "butt," put his mouth on her vagina, and made her lick his nipples several times.  He made her drink something that smelled like alcohol and also drink something from a medicine dosage cup that looked and tasted like Nyquil.  She was at the apartment overnight.  The next day, when someone was banging on the door at length, High told her to be quiet.  Before they left the apartment, High told her never to tell the police anything.  *Id.*

Defense counsel cross-examined the victim at length. *Id.* at 98-136, 144-150-152, 154. He elicited testimony from the victim that she had discussed the events with the prosecutors and her parents. His questioning highlighted several inconsistencies between the victim's statement to police, her testimony at the preliminary hearing, and her testimony at trial, including the color of the bedding, whether the t-shirt High put on her was short-sleeved or a tank top, whether her cell phone was left in High's truck or was in the apartment, whether High had a shirt on when she massaged him, and whether High had tattoos. *Id.*

Clinical and forensic psychologist Dr. Mark Chambers testified for the defense. Exh. 62, pp. 129-162. He stated that suggestibility can be a factor in children's testimony and noted that typically a person's recollection of certain events does not improve but diminishes over time. He stated that certain changes in the victim's testimony over time, including whether it was dark outside when High picked her up, and stating initially to the police that she did not remember what happened but providing details as the interview progressed, might indicate that the victim's statements and testimony were unreliable. He also testified that the manner in which the detective asked about touching and asked follow-up questions might have prompted the victim to fabricate details. Dr. Chambers testified that in his opinion the first interview was "sufficiently conducted" and the fact that the victim later added alleged acts raises the spectre that she was trying to tell the questioners what she thought they wanted to hear rather than tell the truth. *Id.* at 150-158.

The victim's mother testified that she received a call from High—a realtor who was helping the family sell their house—about 9:30 or 10pm on the night in question. Exh. 60, pp. 14-79. High said his daughter was flying into town about 11pm that night, he had a business dinner, and asked that the victim come along to keep his daughter company. He asked the victim's mother to make sure the victim wore a nice dress and stockings because it was a fancy restaurant. After High had picked up the victim, the

mother and aunt both tried without success to call the victim on the cell phone she had with her numerous times. The next afternoon High called the mother, apologized, said he did not know what he was doing and that he did not have a daughter. The mother testified that when she was reunited with the victim the next day, the police advised her not to discuss the incident with the victim, and the mother complied. *Id.*

Evidence was introduced that when the victim was taken to the hospital the next evening, blood and urine tests indicated the presence of some Tylenol (acetaminophen, found in Nyquil) and cocaine metabolite. Exh. 58, pp. 83-88.

A realtor who worked with High, Nestor Salgado, testified that after the victim's mother called the real estate office Salgado went to High's apartment looking for High and the victim and banged on the door for 15-20 minutes with no answer. Exh. 57, pp. 256-273. He was about to drive away when High and the victim came outside; the victim was carrying a bag. He said "Robert, what are you doing. This little girl's missing. There's people looking for her, you know. . . . [High] was just like, shocked and – when I looked at the little girl, I mean she looked really shocked. . . . [High] just turned around – well, put his hand on his face like – his expression, you know, and he just went back – well, he turned around and started walking to the apartment really quick." *Id.* at 258-259.

Detective Jennifer Twers Vershell, with the Metro Crimes Against Youth and Family Unit, testified. Exh. 61, pp. 28-111. She stated that after the incidents the victim had a bag with a torn tank top t-shirt and torn stockings. *Id.* at 47. She testified that Nyquil was found in High's apartment; no drugs or drug paraphernalia was found. *Id.* at 88-102. She testified that the victim was the first to bring up High's name, to discuss Nyquil and to bring up the tongue as a body part with which High touched her. *Id.*

The state-court record shows that the defense expert offered several examples in the victim's statements where he questioned the victim's veracity, and defense counsel extensively questioned the victim about inconsistencies in her testimony. High fails to

explain what a psychological examination would have yielded or to demonstrate that a motion for such examination would have had any likelihood of success. Accordingly, High has not demonstrated that the Nevada Supreme Court's decision affirming the denial of this claim is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The court accordingly denies ground 6(2).

**Ground 5**

High asserts that his Sixth and Fourteenth Amendment rights were violated when appellate counsel rendered ineffective assistance because counsel had a conflict of interest and because counsel failed to include the following meritorious claims in High's direct appeal: (1) State's use of mislabeled, unreliable and contaminated DNA evidence; (2) admissibility of insufficient evidence, including the minor victim's inconsistent statements; and (3) sentencing on redundant convictions (ECF No. 21, pp. 35-36)..

The Sixth Amendment right to counsel encompasses a right to representation free from conflicts of interest. *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir.2004). To establish a violation of the right to conflict-free counsel, the petitioner must show either that (1) in spite of an objection, the trial court failed to allow him the "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial;" or (2) that an actual conflict of interest existed. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Alberni v. McDaniel*, 458 F.3d 860, 869-870.

In several cases in which the United States Supreme Court has defined the right to conflict-free counsel, the defense attorney actively and concurrently represented conflicting interests. *Mickens v. Taylor*, 535 U.S. 162, 166-167 (2002) (discussing earlier authority); *see also Holloway v. Arkansas*, 435 U.S. 475 (1978) (attorney representing co-defendants); *Cuyler*, 446 U.S. at 337-38 (same). In those cases, the Court created, in effect, a distinction between an actual conflict of interest, and a mere

hypothetical one.  Indeed, in *Mickens*, the Court held that "actual conflict" is defined by the effect a potential conflict had on counsel's performance, explaining that: "an actual conflict of interest [means] precisely a conflict that affected counsel's performance-as opposed to a mere theoretical division of loyalties."  *Id.* at 171; 172 n. 5 ("[W]e have used 'conflict of interest' to mean a division of loyalties that affected counsel's performance.").

With respect to a breakdown in the attorney-client relationship, the Supreme Court has made it clear that the Sixth Amendment guarantee of counsel does not guarantee a meaningful attorney-client relationship.  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).  The Ninth Circuit has noted that if a conflict is of an indigent defendant's own making, that is if he or she sabotaged the attorney-client relationship or failed to make reasonable efforts to develop the relationship, he may still have "received what the Sixth Amendment required in the case of an indigent defendant."  *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).

Regarding the claim that appellate counsel failed to raise several meritorious claims, appellate counsel does not have a constitutional obligation to raise every nonfrivolous issue requested by the appellate.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  *Id.* at 751-52.  Thus, petitioner must show his counsel unreasonably failed to discover and raise nonfrivolous issues.  *Delgado v. Lewis*, 223 F.3d 976, 980 (9th Cir. 2000) (citation omitted). It is inappropriate to focus on what could have been done rather than focusing on the reasonableness of what counsel did.  *Williams v. Woodford*, 384 F.3d 567, 616 (9th Cir. 2004) (citation omitted).

The Nevada Supreme Court affirmed the denial of these claims, reasoning,

> Appellant claimed that appellate counsel was ineffective for failing to raise all potential issues on appeal.  Appellant failed to demonstrate that

15

> appellate counsel was deficient or that he was prejudiced. Appellant failed
> to demonstrate that appellate counsel should have raised other issues on
> appeal or that they had a reasonable probability of success on appeal.
> Therefore, the district court did not err in denying this claim.
>
> ....
> [A]ppellant claims that appellate counsel was ineffective because there
> was a conflict of interest based on a "misrepresentation." Appellant failed
> to demonstrate that appellate counsel was deficient or that he was
> prejudiced because appellant failed to allege specific facts that, if true,
> entitled him to relief. *Hargrove v. State*, 686 P.2d 222, 225 (Nev. 1984).

Exh. 118, pp. 4-5.

The state district court had denied these claims because High failed to set forth any specific factual allegations which, if true, would have entitled him to relief. Exh. 112, p. 7.

Here, Clark County Public Defender Amy Coffee filed a motion to withdraw as trial counsel, which was granted. Exhs. 22-24. At the end of the sentencing hearing, the attorney who defended High at trial moved to withdraw. Exh. 69, pp. 15-17. With High present the withdrawing attorney informed the court that he had explained to High that his firm does not handle appeals, that he had spoken with Public Defender Howard Brooks, and that Brooks was expecting the file. High inquired at the hearing as to how long he had to file a notice of appeal. *Id.* Another public defender not yet familiar with the case appeared at the hearing to confirm appellate counsel, and High stated that he had spoken personally to Brooks and "[h]e said he'll pick up the case." Exh. 70. The court, therefore, appointed the public defender. *Id.* High did not object to the appointment of the public defender as appellate counsel. High has presented nothing to support the assertion that an actual conflict of interest existed with his appellate counsel. This portion of ground 5 lacks merit and is denied.

Next, High claims that appellate counsel failed to raise three meritorious issues on appeal. Appellate counsel raised two claims: that prosecutorial misconduct during closing arguments violated High's due process rights and that his excessive sentence violated his Eighth Amendment rights. Exh. 86. High first claims that appellate counsel was ineffective for failing to raise the State's use of mislabeled, unreliable and

16

contaminated DNA evidence (ECF No. 21, p. 36). As discussed at length above, the evidence adduced at trial was that, while the DNA report contained typographical errors, the substance of the report was correct. Further, no evidence was presented that the DNA evidence itself was mislabeled or contaminated. Appellate counsel need not raise every nonfrivolous issue. *Jones*, 463 U.S. at 751. High has not shown a reasonable probability of success of this claim on appeal. Therefore, he has not demonstrated that the Nevada Supreme Court's decision affirming the denial of this claim is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Next, High asserts that appellate counsel should have argued that insufficient evidence, including the minor victim's inconsistent statements, was presented to convict. "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)) (ECF No. 21, p. 36). On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. On habeas review, this court must assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must defer to such resolution. *Id.* at 326. Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence. *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

Again as discussed above, trial counsel cross examined the victim at length regarding the inconsistencies in her statements to police and her testimony at the preliminary hearing and at trial. Other evidence corroborated her testimony, including

that her DNA was found on High's nipples, her family's testimony, and the testimony of the two realtors who worked with High and were present the next day when High and the victim exited the apartment. High has failed to demonstrate that the Nevada Supreme Court's decision affirming the denial of this claim is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Third, High contends that appellate counsel should have presented the claim that he was sentenced for redundant convictions in violation of the double jeopardy clause (ECF No. 21, p. 36; ECF No. 68, pp. 41-45). The Double Jeopardy Clause of the United States Constitution provides that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This protection applies to the states through the Fourteenth Amendment, and prevents a state from imposing multiple punishments for the same offense. *See Benton v. Maryland*, 395 U.S. 784, 794 (1969); *Whalen v. United States*, 445 U.S. 684, 688 (1980), respectively. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299 (1932) (internal citation omitted).

If the offenses are not related, the next stage of the analysis is one of statutory intent. Even where duplicitous convictions amount to separate offenses under *Blockburger*, one of the convictions cannot stand if they are "redundant convictions that do not comport with legislative intent." *See Salazar v. State*, 70 P.3d 749, 751 (Nev. 2003). Nevada's redundancy doctrine addresses the situation where a defendant is convicted of multiple offenses that, as charged, punish the exact same illegal act. *Salazar*, 70 P.3d at 751 (quoting *State of Nevada v. Dist. Ct.*, 994 P.2d 692, 698 (Nev. 2000)). In determining if two convictions are redundant, courts consider "whether the

material or significant part of each charge is the same even if the offenses are not the same." *Id.*

High argues that there was a reasonable possibility that but for raising this issue the result of the appeal would have been different because High was convicted of two crimes for the same one act. High was convicted of six counts of lewdness with minor under age 14 -- counts 2, 3, 4, 6, 7, 10. Exh. 66. Counts 2, 6, 7, and 10 were based on having the victim lick his nipples. *Id.*; exh. 10. Count 3 was based on touching the victim's buttocks. Count 4 was for touching the victim's genital area. *Id.* High asserts that he was convicted of both lewdness in count 4—a touching or fondling of the genital area—and sexual assault in count 5—a placing of the mouth and/or tongue on or in the genital opening—based on the victim's testimony that the only time that High had touched her genital area was when he licked her vagina (ECF No. 68, pp. 41-44).

The transcript of the victim's interview with Detective Twers was admitted at trial. *See* exh. 61, p. 28. During defense questioning, Detective Twers testified—referring directly to the interview transcript—that the victim said that High "touched her private spot with his finger and his tongue." Exh. 60, p. 77. The detective's testimony also reflects that during the interview she asked the victim if she remembered if High touched her private parts with anything other than his finger and the victim indicated that he also used his tongue. *Id.* at 81. High's contention that his convictions for counts 3 and 4 are redundant is, therefore, belied by the record. High has not shown a reasonable probability of a different outcome had appellate counsel raise this or any of the claims raised in ground 5.

High has failed to demonstrate that the Nevada Supreme Court's decision affirming the denial of any of the claims that correspond to federal ground 5 was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 5.

**Ground 1**

High alleges that the prosecutions' repeated use of improper arguments during closing violated his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial (ECF No. 21, pp. 17-22).

In reviewing prosecutorial misconduct claims, the narrow issue the federal habeas court may consider is whether there was a violation of due process, not whether there was misconduct under the court's broad exercise of supervisorial power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). It is "not enough that the prosecutors' remarks were undesirable or even universally condemned[,] [t]he relevant question is whether the prosecutor's comments so 'infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (quoting *Darden*, 477 U.S. at 181). The ultimate question before the court is not whether misconduct denied a fair trial, but whether the state court's resolution of the claim was an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999).

High contends in ground 1(B) that the prosecutor asked the jurors to put themselves in the place of the victim, which improperly personalized the alleged victim and violated what is known as the "Golden Rule" (ECF No. 21, p. 21).

A "Golden Rule" argument is "a jury argument in which a lawyer asks the jurors to reach a verdict by imagining themselves or someone they care about in the place of the injured plaintiff or crime victim." 75A Am. Jur. 2d Trial § 547. The "Golden Rule" argument is generally impermissible "because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Id. Dyleski v. Grounds*, 2016 WL 3194997 *37 (N.D. Cal. 2016).

The prosecutor argued during closing:

> Please use your common sense. [The victim] is not responsible for the bad decisions of the adults around her. She's not responsible for the mistakes of that Metro lab. Those stakes – mistakes, they are not – do not prejudice Mr. High. Don't let them prejudice your decision, and don't

20

let them prejudice your common sense.  [The victim] deserves the application of your common sense in this case.

Exh. 64, pp. 149-150.

Considering this claim on direct appeal, the Nevada Supreme Court stated:

> Appellant contends that the prosecutor's statements that the jury should not hold the victim responsible for the mistakes made by the police and her parents and that she deserved the jury's "application of [its] common sense" constituted an improper "Golden Rule" argument.  *See Williams v. State*, 113 Nev. 215, 945 P.2d 438, 445 (1997) (noting that "[a] 'Golden Rule' argument asks the jury to place themselves in the shoes of the victims" and is improper), receded from on other grounds by *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000).  Considering the comments in context, we conclude that the prosecutor merely argued that the jury should not let errors made by others affect the victim's credibility and that the State had proved its case.  Therefore, the comments were not improper.

Exh. 94, p. 2.

State witnesses admitted that there were typographical errors in the DNA report. The prosecutor argued in closing that the errors should not affect the jury's view of the victim's testimony.  High has not demonstrated that the Nevada Supreme Court's decision was arbitrary or an unreasonable application of clearly established federal law.

Next, in ground 1(C) High argues that the prosecution improperly characterized High's defense as "smoke and mirrors" during closing arguments (ECF No. 21, p. 21).

> I'm going to ask you to walk through the smoke and mirrors.  Okay. I'm going to ask you to use your common sense.  I'm going to tell you why the DNA evidence in this case absolutely corroborates why this – what this child told you.  There are typographical errors, in that first report, and that is not to be imputed to [the victim].  [The victim] should not bear the reporting errors.  Not testing errors, reporting errors.

Exh. 64, pp. 137-138.

The Nevada Supreme Court rejected the contention that the statements were improper:

> Considering the arguments in context, we conclude that the prosecutor simply responded to counsel's challenges to the quality of the police investigation and the victim's and her family members' credibility. Accordingly, the prosecutor's argument was not improper.

Exh. 94, p. 2.

As in 1(B) above, the prosecutor was urging the jury not to let the errors in the DNA report impugn the victim's credibility. The Nevada Supreme Court's decision was not arbitrary or an unreasonable application of clearly established federal law.

High contends in ground 1(D) that the prosecutor improperly characterized the reasonable doubt standard (ECF No. 21, p. 22).

> [Defense counsel] spent a portion of time talking about reasonable doubt. Reasonable doubt is the standard they use in every Nevada criminal court room. It's the standard they use in every criminal courtroom across the United States. It's used to convict people that snatch kids, people that sexually offend everywhere. [Defense counsel] asked you to continue with your presumption of innocence for the Defendant. The remainder of that instruction is to presume he is innocent until the contrary is proved. I submit [to you] that has been done in this case.

Exh. 64, p. 141.

The Nevada Supreme Court reasoned:

> Although "[a] prosecutor may suggest that the presumption of innocence has been overcome," she "may never properly suggest that the presumption no longer applies to the defendant." *Morales v. State*, 143 P.3d 463, 467 (Nev. 2006). We conclude that the comments were not improper but reflected the prosecutor's contention that appellant's guilt had been proved in response to his argument that the prosecution had failed to meet its burden of proof. *See Moore v. Curry*, 2009 WL 3007737 at *5-6 (N.D. Cal. 2009) (concluding that prosecutor's comment that presumption of innocence disappeared at close of evidence was not improper because prosecutor subsequently explained that prosecution had proved defendants' guilt beyond reasonable doubt).

Exh. 94, pp. 1-2.

High has failed to demonstrate that the Nevada Supreme Court's conclusion that the prosecutor properly argued that the State had proved its case is arbitrary or unreasonable. Finally, in ground 1 High argues that these alleged errors individually and cumulatively violated High's rights to due process and a fair trial (ECF No. 21, p. 22). As the court has concluded that the claims in ground 1 lack merit, there are no errors to consider individually or cumulatively. High has not met his burden of showing

that the Nevada Supreme Court's decision rejecting any of the claims that correspond to federal ground 1 was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Therefore, federal habeas relief is denied as to ground 1.

**Ground 4**

High contends that his sentence of 25 years to life is excessive and violates the Eighth and Fourteenth Amendments because the victim did not suffer substantial bodily harm and his prior convictions were old and for property crimes, not sexual assault (ECF No. 21, pp. 34-35).

The Eighth Amendment forbids cruel and unusual punishment, such as "barbaric punishments," *Solem v. Helm*, 463 U.S. 277, 284 (1983), and "extreme" sentences that are "grossly disproportionate" to the crime, *Ewing v. California*, 538 U.S. 11, 23 (2003). The Eighth Amendment does not, however, require strict proportionality between crime and sentence. *Id.* In *Lockyer v. Andrade*, the Supreme Court invoked a "gross disproportionality principle," the "precise contours of [which] are unclear," and which applies "only in the 'exceedingly rare' and 'extreme' case." 538 U.S. 63, 72-73 (2003)(citations omitted). In determining whether a sentence is grossly disproportionate, the reviewing court considers the severity of the sentence, the gravity of the offense, and the defendant's criminal history. *Taylor v. Lewis*, 460 F.3d 1093, 1098-1101 (9th Cir. 2006) (upholding a sentence of 25 years to life under California's three-strikes law). Successful challenges based on proportionality are "exceedingly rare." *Id.* at 1098. A long sentence may be constitutional even if the most recent offense was minor or nonviolent. *See, e.g., Andrade*, 538 U.S. at 77; *Ewing*, 538 U.S. at 30-31; *Rummel v. Estelle*, 445 U.S. 263, 285 (1980).

In *Solem*, the Supreme Court held that the sentence of life without the possibility of parole under a recidivist statute for uttering a "no account" check for $100 violated the

Eighth Amendment.  463 U.S. at 284.  The Court considered that petitioner's previous

convictions – third-degree burglary, obtaining money under false pretenses, grand

larceny, driving while intoxicated – were all nonviolent, were not crimes against a

person, and alcohol was a contributing factor in each case.  *Id.* at 279-280.  However, in

*Andrade*, the Court upheld two terms of 25 years to life under California's three-strikes

law where Andrade was arrested for stealing videotapes at two Kmart stores and had

three previous first-degree residential burglary convictions.  538 U.S. at 68, 77.  The

Court also upheld the three-strikes law sentence in *Ewing v. California*, where Ewing

was sentenced to 25 years to life for felony grand theft when he stole three golf clubs

worth about $1200.  538 U.S. at 20.  Ewing had three prior felony burglary convictions

and one felony robbery conviction.  *Id.* at 19-20.

On direct appeal, the Nevada Supreme Court stated:

> Appellant also challenges his sentence of life in prison with the
> possibility of parole after 20 years for sexual assault of a minor as
> constituting cruel and unusual punishment because the offense was a
> single act of sexual assault and the victim was not physically harmed.
> Because the sentence falls within the statutory limits, *see* NRS 200.366,
> and is not unduly disproportionate to the crime, the punishment is not
> cruel and unusual.  *See Allred v. State*, 92 P.3d 1246, 1254 (Nev. 2004).

Exh. 94, p. 3.

Here, High was sentenced in accordance with the statute for first-degree kidnapping

with no substantial bodily harm to 5 years to life; on the lewdness convictions -- counts

2, 3, 4, 6, 7, 10: to ten years to life on each count, to run concurrently to each other and

to count 1; on count 5 for the sexual assault: twenty years to life, consecutive to count 1;

and count 9 – administration of a drug to aid in the commission of a felony: sixteen to

seventy-two months, to run concurrently with counts 1-7.  Exh. 69 at 12-14.

The sentences for kidnapping and administration of a drug were within the possible

sentences provided for by statute.  NRS 200.320(2); 200.405.  The sentences for

lewdness and sexual assault were mandatory.  NRS 201.230(2); 200.366(3)(c)

(operative version at time of conviction).  Respondents point out that the criminal

statutes for kidnapping and sexual assault specifically designate punishment based on whether the victim suffered substantial bodily harm (ECF No. 62, pp. 34-38). The state district court ordered count 5 to run consecutively to count 1, but ordered all other sentences to run concurrently. High was convicted of kidnaping and sexually assaulting an eight-year-old. This court agrees with respondents that High has failed to demonstrate that his sentence constitutes a "most extreme circumstance" that would warrant vacating it. *Rummel*, 445 U.S. at 265-66, 274 n.11. High has not shown that the Nevada Supreme Court's affirmance of his sentence was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts. 28 U.S.C. § 2244(d). Ground 4 lacks merit and is denied.

**Ground 7**

Finally, High argues that he is entitled to habeas relief because of the cumulative effect of errors raised on appeal and in his federal petition (ECF No. 21, p. 37).

Under Ninth Circuit precedent, habeas relief may be available based on the aggregate effect of multiple errors even though the errors considered in isolation do not rise to the level of a constitutional violation. *See Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2003). "[C]umulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

As set forth in this order, High's claims of error lack merit. In addition, the evidence against High was strong. Thus, the cumulative impact of any errors would fall well short of rendering the proceedings fundamentally unfair and a due process violation. Ground 7 is denied. 28 U.S.C. § 2254(b)(2).

Therefore, the petition is denied in its entirety.

### IV. Certificate of Appealability

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating High's petition, the court finds that none of those rulings meets the *Slack* standard. The court therefore declines to issue a certificate of appealability for its resolution of any of High's claims.

### V. Conclusion

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 21) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

Dated: June 19, 2017.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE